IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. C 11-677 CW |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS (Docket No. 9) |
| v. | |
| EMORU OBOKE OBBANYA, | |
| Defendant. | |

Defendant Emoru Oboke Obbanya seeks to suppress all evidence obtained as a result of the seizure of his person and the searches of his house, his computers and other electronic storage devices, and all statements that he made to law enforcement officers during custodial interrogation. Plaintiff United States of America opposes the motion. Having considered the papers filed by the parties and their oral arguments at the hearing, the Court GRANTS Defendant's motion in part and DENIES it in part.

BACKGROUND

At approximately 12:33 p.m. on July 18, 2009, two officers from the Berkeley Police Department went to a residence located at 976 Grizzly Peak Boulevard in Berkeley, California in response to a 911 hang-up call, for which there had been no answer when dispatch called back on the residence line. Cobert Suppl. Report, at EOO-25; Leavitt Decl., Ex. 2 (Search Warrant Affidavit), at EOO-54. The officers knocked on the door and announced their presence as police officers. Cobert Suppl. Report, at EOO-25. One officer heard footsteps and saw the door handle move, but no one responded at first. Id.

After a short time, a man later identified as Defendant came through the front door onto the porch and closed the door behind him. Id. According to the officers, Defendant seemed agitated and hostile. Id. He asked what the officers wanted, and they told him they were responding to a 911 hang-up call and wanted to check on the welfare of the residents. Id.

Defendant yelled that the police could not come into his house and yelled derogatory comments about the police, using profanity. Id. He told the police that he was okay and told them to leave. Id. When an officer told the man that they "needed to check the house to make sure that no one inside the house had called in need of help," Defendant again told the police that they could not enter the house. Id. When an officer asked Defendant if he had a weapon on him, Defendant did not answer his question and responded only with profanity. Lathrop Suppl. Report, at EOO-4.

Defendant initially refused to give the police any identifying information, but eventually identified himself truthfully as Emoru Obbanya. Cobert Suppl. Report, at EOO-25. He offered to get the police his license, which he said was in his pants pocket on the bathroom floor inside the house. Id. at EOO-26. The police refused his offer. Search Warrant Affidavit, at EOO-53. Defendant also gave the police his date of birth and explained that he may have called 911 accidentally while he "was trying to call his father whose phone number started with '918.'" Lathrop Suppl. Report, at EOO-5.

Because of Defendant's uncooperative and hostile demeanor, the police handcuffed him and eventually placed him under arrest. Cobert Suppl. Report, at EOO-26.

Two officers entered Defendant's home, while a third officer remained outside with Defendant. Id. The two officers determined that there was no one else inside. Id. While inside the house, the police saw in plain sight shotgun shells that had been cut open, gun cleaning solvent, gun cleaning patches and a gun periodical, along with bills addressed to Defendant at the Grizzly Peak address. Id.; Grant Suppl. Report, at EOO-22. The officers also found Defendant's license in the pocket of jeans in the bathroom, where Defendant had told them it was. Cobert Suppl. Report, at EOO-26.

Later that afternoon, one of the officers sought a warrant to search Defendant's house. Lathrop Suppl. Report, at EOO-6. The affidavit recounted the officers' contact and conversations with Defendant. Search Warrant Affidavit, at EOO-53. It explained that the police had entered the house based on exigent circumstances and saw, in what appeared to be Defendant's bedroom, shotgun shells that had been cut in half, gun solvent, and gun cleaning patches and, in a downstairs computer room, a gun periodical. Id. at EOO-54. The affidavit also stated that one of the officers "discovered a hunting permit and handgun safety course certificate" while he was taking Defendant's identification out of the pocket of his pants on the bathroom floor. Id. According to the affidavit, Defendant "had been convicted of PC 417(a)(1) in 2002, which prohibits him from possessing or owning a

firearm or ammunition."[1]  Id.  Based on the "gun cleaning supplies, shotgun shells that had been cut in half, and gun magazines," the affidavit stated that there was probable cause to believe that a twelve gauge shotgun, twelve gauge shotgun ammunition and firearm cleaning supplies, including patches, solvent and cleaning brushes, were at the Grizzly Peak residence. Id.

At approximately 5:23 p.m. on that day, a state magistrate issued a warrant to search the house for "[a]ny and all firearms and ammunition . . . and any and all firearm cleaning equipment." Search Warrant, at EOO-51.

Officers executing the search warrant found a locked footlocker in Defendant's room.  Lindenau Suppl. Report, at EOO-19.  Opening it with keys that the officers located in the pants that were still on the floor of the bathroom, the officers found a flare gun that appeared to have been converted into a .38 caliber handgun, ammunition and materials that appeared to be usable for making explosives.  Id. at EOO-19-20.  Some of the bottles were labeled as glycerin and acetone.  Id. at EOO-19.  The officers also found a bottle containing a crystallized material. Id.  The officers saw multiple computers and hard drives in the house.  Leavitt Decl., Ex. 4 (Second Search Warrant Affidavit), at

---

[1] The United States concedes that the reference in the affidavit to a prohibition on the possession of ammunition was a misstatement and that Defendant's conviction for violation of California Penal Code § 417(a)(1) made it a crime for him to possess a firearm but not ammunition.  See California Penal Code §§ 12021(c)(1) (repealed 2012), 29805.

4

EEO-58. One officer seized a computer from Defendant's parents' car without a warrant. Lindenau Suppl. Report, at EOO-20.

After the officers found the materials alleged to be usable for making explosives, the bomb squad was contacted. Id. The lieutenant in charge of the bomb squad advised the officers at the scene that the chemicals that they found were precursors for making bombs and that the crystallized material could be an explosive. Id. at EOO-19-20. At the instruction of the lieutenant, neighbors in the surrounding houses were evacuated. Id. at EOO-20. A Berkeley police officer, Officer Grant, was sent to the Berkeley City Jail, to which Defendant had been transported, to question Defendant. Grant Suppl. Report, at EOO-23. Grant was told to "attempt to obtain a statement about this incident from" Defendant, that he should "pay particular attention to obtaining information about the danger posed by any and all items in the house" and "that in the event [Defendant] asked to speak to a lawyer [the officer] was to continue questioning under the public safety acception [sic]." Id.

At the jail, Defendant asked Grant a few questions about the charges against him and then asked Grant to read him his Miranda rights. Id. Grant advised him of his rights, and Defendant "requested a lawyer." Id. Grant turned off his recorder and questioned Defendant extensively about certain items found during the search of his home. Id. at 23-24. Defendant answered Grant's questions and told him what was inside the trunk and containers inside the trunk. Id. He denied making or possessing explosives, but stated "I can't say anything to refute that" when asked if the trunk contained bomb-making materials. Id. When asked what was

5

in a lockbox in the trunk, Defendant told Grant that the lockbox contained, among other things, a flare gun. Id. at 24. Defendant also stated the substances in the trunk included baking soda powder, acetone and a "'legal hallucinogen' called DMT, which he had purchased over the Internet." Id. at 23-24.

The following day, on July 19, 2009, the police sought and obtained a second search warrant, to search for and seize materials related to the making of explosives, "explosive making literature" and "computer, hard drives, flash drives, DVD's, and CD's which may contain electronic files containing manuals, diagrams, and schematics pertaining to making an explosive." Leavitt Decl., Exs. 5 and 6. The warrant was executed that day and the police seized many items, including computers, hard drives, compact disks, cell phones and other electronic data-storage equipment. Leavitt Decl., Ex. 7.

On July 19 or 20, 2009,[2] at Defendant's request, a special agent (SA) of the Federal Bureau of Investigation (FBI), and a task force officer (TFO), went to the jail to interrogate him again. Leavitt Decl., Ex. 11 at EOO-107. Defendant made additional statements to them during this second interrogation. Id. Among other things, Defendant stated that he had visited web forums where people discussed explosives and bomb making, but denied looking at that material. Id. at 108. Defendant stated that the white crystallized residue found in several plastic

---

[2] Both Defendant and the United States agree that the second interview took place on July 19, 2009. Mot. at 6; Opp. at 19 n.5. However, the FBI report indicates that the interview took place on July 20, 2009. Leavitt Decl., Ex. 11 at EOO-107.

6

bottles in his house was the remnants of a baking powder and water solution that he used to treat an upset stomach. Id.

Several months later, the computers and hard drives were searched by both a Berkeley police officer and the Silicon Valley Regional Computer Forensics Laboratory. Leavitt Decl., Exs. 8 and 9. The police officer states that, on October 26, 2009, he obtained a warrant to search the computers and hard drives. Leavitt Decl., Ex. 9 at EOO-33.

On September 20, 2011, the Grand Jury returned an indictment charging Defendant with a violation of 26 U.S.C. § 5861(i) for knowing possession of a firearm not identified by a serial number, based on his possession of the modified flare gun found during the search of his home. Docket No. 1.

## DISCUSSION

I. Evidence obtained during the warrantless July 18, 2009 search

Defendant seeks to suppress the evidence obtained while the police detained him and searched his home without a warrant on July 18, 2009.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. Its "central requirement" is one of "reasonableness." Tex. v. Brown, 460 U.S. 730, 739 (1983). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). "[W]arrants are generally required to search a person's home or his person unless the

7

'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94 (1978).

One such exigency "obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). "Thus, law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Michigan v. Fisher, 130 S. Ct. 546, 548 (2009) (per curiam) (quoting Brigham City, 547 U.S. at 403). "In order to prove that the exigent circumstances doctrine justified a warrantless search, the government must show that: '(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need.'" United States v. Reyes-Bosque, 596 F.3d 1017, 1029 (9th Cir. 2010) (quoting United States v. Snipe, 515 F.3d 947, 952 (9th Cir. 2008)).

Examination of the totality of the circumstances in this case demonstrates that the officers had an objectively reasonable basis for entering the house to conduct a sweep for someone inside the house who was in immediate need of assistance. See Johnson v. City of Memphis, 617 F.3d 864, 869 (6th Cir. 2010) (911 hang-up call, combined with unanswered return and open door with no response from within, satisfied the exigent circumstances requirement); Hanson v. Dane County, 608 F.3d 335, 337 (7th Cir.

2010) (911 hang-up call and unanswered call back constituted probable cause for entry); United States v. Najar, 451 F.3d 710, 718-720 (10th Cir. 2006) (911 hang-up call, combined with disconnected call backs and the defendant's lack of cooperation, satisfied requirement). "As other courts have recognized, '911 calls are the predominant means of communicating emergency situations.'" Najar, 451 F.3d at 719 (quoting United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir. 2002)). See also Hanson, 608 F.3d at 337 ("The 911 line is supposed to be used for emergencies only."). "A lack of an answer on the return of an incomplete emergency call implies that the caller is unable to pick up the phone--because of injury, illness (a heart attack, for example), or a threat of violence." Hanson, 608 F.3d at 337. See also Snipe, 515 F.3d at 952 n.6 (quoting United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995)) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams."). The 911 hang-up call, combined with the lack of answer on the return and Defendant's overtly aggressive and hostile behavior and refusal to answer basic questions, provided a reasonable basis for the officers to conduct a protective sweep of the house to ensure that no one inside was in need of immediate help. While Defendant had a right to respond as he did, this nevertheless did not dispel the officers' concern for the safety of the occupants.

The officers also had the authority to detain Defendant while they conducted a protective sweep of the house. "An officer's authority to detain incident to a search is categorical."

9

Muehler v. Mena, 544 U.S. 93, 98 (2005). The Supreme Court has stated that, in a detention incident to a search of a house, "the detention of an occupant is 'surely less intrusive than the search itself,'" and that this incremental intrusion is outweighed by "legitimate law enforcement interests that provide substantial justification for detaining an occupant," including "preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search." Id. (quoting Michigan v. Summers, 452 U.S. 692, 702-03 (1981)) (internal quotation marks omitted). Here, where the officers had reason to believe that there was someone inside the house in immediate need of assistance, possibly due to Defendant's acts, these legitimate interests are magnified and the officers had the authority to detain him to effectuate the search.

Thus, the officers' search of the areas of the house in which a person in need of assistance could have been, and their corresponding detention of Defendant, were reasonable. During that search, they legitimately observed items in plain view in those areas, including the shotgun shells, magazines and gun cleaning supplies. However, the officers' search of the pants on the bathroom floor, which the United States concedes was "questionable," exceeded the scope reasonable to address the exigent need, because the officers had no reasonable basis for searching the pants in the course of looking for someone in harm's way. Accordingly, Defendant's motion to suppress is GRANTED to the extent that Defendant seeks to exclude the evidence that the

officers discovered while searching the pants, namely the hunting permit and handgun safety course certificate.

II. Evidence obtained pursuant to the first search warrant

Defendant seeks to suppress evidence obtained pursuant to the first search warrant. Defendant alleges that the statements in the supporting affidavit, if true, did not establish probable cause.

Before issuing a search warrant, a judge must only answer a "commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)). Probable cause means a "fair probability" that, under the totality of the circumstances, including reasonable inferences, contraband or evidence is located in a particular place. United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (citing Gates, 462 U.S. at 246; Gourde, 440 F.3d at 1069). Because the information regarding the hunting permit and handgun safety course certificate was illegally obtained, the Court "purge[s] the affidavit of the offending facts and examine[s] whether the remaining facts still afford[] a substantial basis for concluding that the search warrant was supported by probable cause." United States v. Bishop, 264 F.3d 919, 924 (9th Cir. 2001). In conducting this examination, the Court is mindful that the issuing judge's "determination 'should be paid great deference.'" Gourde, 440 F.3d at 1069 (quoting Gates, 462 U.S. at 236).

The Court concludes that the affidavit, even without the references to the permit and certificate, contained a substantial

11

basis for concluding that a search of Defendant's house would yield evidence that he owned or possessed firearms, which he was prohibiting from doing because of his 2002 conviction.  The affidavit stated that, while conducting a protective sweep of the home, officers had observed various gun cleaning materials, shotgun shells and gun magazines in plain view.  Under the totality of the circumstances, it was reasonable to infer from these items that Defendant had firearms on the premises.

Defendant also alleges that the affidavit supporting the warrant contained material misrepresentations and omissions and that, with these corrected, the affidavit would not have established probable cause.  However, Defendant does not make a sufficient preliminary showing in support of either argument.

Defendant alleges that certain statements in the affidavit were untrue, because they were inconsistent with the statements of the officers who detained Defendant and conducted the protective sweep.  However, this is not accurate.  For example, Defendant states that neither officer who entered the house described the room in which the shotgun shells and gun cleaning supplies were found as appearing to belong to Defendant; however, one officer stated that this room appeared to be Defendant's room, because he found bills with Defendant's name taped to the mirror.  See Grant Suppl. Report, at EOO-22.  Defendant also claims the affidavit misstated that the officers saw twenty-two shells, gun-cleaning patches and a gun periodical, because one officer reported only that he saw two shotgun shells and gun cleaning solvent; however, the other officer reported that he saw "two 12 gauge shot gun shells in an open safe and twenty 12 gauge shotgun shells in an

12

open box in the closet, . . . gun solvent on the dresser, and . . . gun cleaning patches on the floor" in the bedroom and "a gun periodical" in the downstairs computer room. Id.

Defendant also claims that a number of facts were omitted from the affidavit; however, these facts are not material to the determination of whether there was probable cause to believe that a search of the house would yield evidence of wrongdoing or contraband and Defendant makes no argument to the contrary. Further, while there is no dispute that the affidavit incorrectly stated that Defendant was not permitted to possess or own ammunition because of his 2002 conviction, Defendant has not shown that the remaining allegations were insufficient to support a finding of probable cause that Defendant possessed or owned a gun.

Accordingly, Defendant's motion to suppress the evidence obtained pursuant to the first search warrant is DENIED.

III. Statements made during the July 18, 2009 interrogation

Defendant seeks to suppress the statements that he made to Officer Grant during the July 18, 2009 interrogation after Defendant invoked his right to an attorney. The United States concedes that Defendant was subjected to custodial interrogation and that the questioning continued after he requested an attorney, but argues that Officer Grant was permitted to continue questioning Defendant, under the public safety exception, even after he requested a lawyer.

The public safety exception to the requirement of providing Miranda warnings allows police officers to "ask questions reasonably prompted by a concern for the public safety." New York v. Quarles, 467 U.S. 649, 655-56 (1984). See also United States

v. De Santis, 870 F.2d 536, 541 (9th Cir. 1989) ("The same considerations that allow the police to dispense with providing Miranda warnings in a public safety situation also would permit them to dispense with the prophylactic safeguard that forbids initiating further questioning of an accused who requests counsel."). In order for the public safety exception to apply, there must have been "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." United States v. Martinez, 406 F.3d 1160, 1165 (9th Cir. 2005). Questioning under this exception must be "necessary to secure their own safety or the safety of the public" and may not be investigatory in nature. Quarles, 467 U.S. at 658-59.

Here, when the officers executing the first warrant opened his trunk, they found materials that they reasonably believed were bomb-making supplies and finished product that placed the officers and neighbors in surrounding houses at immediate risk should an explosion take place. Thus, Officer Grant was permitted to ask Defendant questions that were reasonably tailored to neutralize that risk, including whether there were explosive devices or booby traps in the house and what the crystallized substance was. Accordingly, Defendant's motion to suppress is DENIED to the extent that the officer's questions were specifically related to the presence of explosives or dangerous materials in the house.

However, other questions that were asked went beyond the need to secure officer or public safety and were instead investigatory in nature. For example, Officer Grant asked Defendant more generally what was in the locker and what the red cord was, and he engaged Defendant in a conversation regarding his possession of

14

1 ammunition. Because these questions were investigatory in nature
2 and went beyond the need to protect the police or the public from
3 any immediate danger, Defendant's motion to suppress is GRANTED as
4 to the answers to these questions.

IV. Evidence obtained during the July 19, 2009 search and subsequent computer searches

Defendant seeks to suppress evidence from the computers and other electronic data-storage devices that the government seized and subsequently searched. The United States has stated that it "has no intention of using any information resulting from the search and seizure of the computers." Opp. at 19. Accordingly, the Court DENIES Defendant's motion to suppress this evidence as moot, without prejudice to Defendant re-raising his motion should the United States seek to introduce this information into evidence.

V. Statements made during the July 19 or 20, 2009 interrogation

Defendant seeks to suppress the statements that he made to the FBI personnel. However, Defendant initiated this interview by requesting that the FBI speak with him. Further, there is no dispute that Defendant voluntarily signed an advice of rights form to waive his <u>Miranda</u> rights prior to the interrogation. Accordingly, the Court DENIES Defendant's motion to suppress the statements made to the FBI personnel.

CONCLUSION

For the reasons set forth above, the Court GRANTS in part Defendant's motion to suppress and DENIES it in part. It is hereby ORDERED that the identification, hunting permit and handgun safety course certificate found in Defendant's jeans pocket during

the warrantless July 18, 2009 search of his home be SUPPRESSED. It is further ORDERED that statements made by Defendant during the July 18, 2009 interrogation after he invoked his right to an attorney, other than those directly related to immediate danger, be SUPPRESSED.

IT IS SO ORDERED.

Dated: 3/13/2012

CLAUDIA WILKEN
United States District Judge